In re William A. HUNTER, Esq.

[656 A.2d 203]

No. 94-275

December 22, 1994. Pursuant to the recommendation of the Professional Conduct Board filed May 23, 1994, and approval thereof, it is hereby ordered that William A. Hunter, Esq., be publicly reprimanded and placed on probation for nine months for the reasons set forth in the Board's final report attached hereto for publication as part of the order of this Court. A.O. 9, Rule 8E. .

The probationary period shall begin on January 1, 1995 and end on September 30, 1995.

## FINAL REPORT TO THE SUPREME COURT

This case involves a continuing pattern of neglect of clients and disregard of requests from bar counsel for information necessary to her investigation of these allegations. We recommend to the Supreme Court that respondent be publicly reprimanded and placed on probation for nine months.

We make this recommendation based upon the report of the hearing panel which we accepted after due consideration of the oral arguments of the parties who appeared before us on April 1, 1994, pursuant to Rule 8D of Administrative Order 9.

## A. *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

Respondent, William A. Hunter, has been a member of the Vermont Bar since December 19, 1985 and is currently on active status. At all times relevant to this matter, respondent was operating two store front law offices: one in Ludlow and the other in Windsor.

## COUNT I - PCB FILE NO. 91-43

Elaine Broekhuizen retained respondent on December 11, 1990 to advise her on her responsibilities as the co-executrix of her father's will and to represent her in that role. The other co-executor was her brother, Willis Antonovich, from whom she had been estranged for years. The estate was a complicated one. Mr. Antonovich had been left the family home, among other valuable assets. Mrs. Broekhuizen had been given primarily personal property. Although the will was skewed in favor of Mr. Antonovich, Mrs. Broekhuizen did not want to contest it.

Some of the valuable personal property that Mrs. Broekhuizen was to receive was located in the family home. Mrs. Broekhuizen stressed to respondent in their first meeting that she was concerned about her brother's son living in the family home before the estate was settled. She told respondent that she was concerned about the safety of her valuables and the impending task of inventorying. She instructed respondent to proceed to have her nephew moved out of the home.

Respondent's first effort to have the nephew move from the home occurred on January 4, 1991, in a telephone call to Mr. Antonovich. Respondent followed up this call with a letter, dated January 8, 1991. The nephew moved out on January 19, 1991, five weeks after Mrs. Broekhuizen personally observed some mistreatment of her property by her nephew and was distressed that he remained in the house. She, however, ultimately received all property to which she was entitled with no diminution in value.

Although the Petition to Open the Estate was filed on January 8, 1991, the appointment of the co-executors did not occur until April 8, 1991, due to a delay in the surety bond. Mrs. Broekhuizen and respondent set up a procedure whereby, during this time period, some estate bills were paid. A total of just under $ 2,000 of future estate funds was placed in respondent's trust account. When Mrs. Broekhuizen presented bills to respondent, he was to pay them.

Respondent was not timely in making all payments. Mrs. Broekhuizen repeatedly had to call respondent or his office to secure payment of bills previously submitted.

Respondent did make special arrangements to have an emergency delivery of heating oil to the family home on a Saturday.

Mrs. Broekhuizen instructed respondent to arrange with Mr. Antonovich that his son pay for the utilities of the home, including the telephone, while he was

living there. Respondent wrote only one letter to Mr. Antonovich regarding this issue. At one point, the telephone in the family home was disconnected because of nonpayment.

In March 1991, Mrs. Broekhuizen delivered to respondent a list of questions about her father's will and estate. Although respondent recalls discussing the questions with his client, Mrs. Broekhuizen maintains that respondent never addressed the list whatsoever. We find that respondent did not answer the questions in a way satisfactory to his client.

Respondent had several meetings with his client and Mr. Antonovich. He had many telephone conversations with Mrs. Broekhuizen. Nonetheless, respondent failed to return many of Mrs. Broekhuizen's telephone calls. Respondent cancelled three meetings in one week with Mrs. Broekhuizen to go over the estate's taxes. According to respondent, the reason for these cancellations was scheduled court hearings running late. Respondent's failure to maintain contact and failure to meet appointments was frustrating to Mrs. Broekhuizen.

Mrs. Broekhuizen consulted with Barry Polidor, Esq. on May 9, 1991. By letter dated May 12, 1991, Mrs. Broekhuizen informed Mr. Polidor that she wanted to retain him. He informed her that once she received her file from respondent, he would file a notice of appearance.

For the next month, Mrs. Broekhuizen repeatedly called respondent and his office in an attempt to obtain her file. Respondent failed to return her telephone calls. She was not successful in reaching him.

On June 3, 1991, Mr. Polidor filed his notice of appearance and sent a copy to respondent. That same date Mr. Polidor sent respondent a letter requesting the file and the monies of the estate held in trust. Mrs. Broekhuizen continued calling

to get the file. Leslie Black, Esq. (whom Mr. Antonovich had retained) wrote to respondent on June 26, 1991 with the same requests. Respondent turned over the file on July 1, 1991.

A complaint was filed with the Professional Conduct Board. On July 31, 1991, the Chair of the Board sent to respondent a copy of the complaint and asked respondent to submit a written response to the allegations within twenty days. Respondent failed to answer.

Bar counsel made a similar request to respondent on August 27, 1991. On September 9, 1991, respondent submitted a response to the complaint. He generally denied Mrs. Broekhuizen's allegations about his performance, but neglected to address most of the specifics in the complaint.

Investigator Jean Cass wrote to respondent on October 29, 1991 and informed him that his response did not address a number of allegations raised in the complaint. Respondent was asked to respond to eight specific questions and to submit a copy of his file. Respondent did not respond.

On November 26, 1991, Jean Cass wrote to respondent and reminded him of her request of October 29, 1991, and that his failure to respond to a reasonable request for information may constitute grounds for discipline under the rules of the Vermont Supreme Court. Respondent did not reply.

Bar counsel next wrote to respondent on April 1, 1993, requesting a response to Ms. Cass' questions in her October 29, 1991 letter. Bar counsel reminded respondent that several attempts were made in 1991 to obtain a copy of respondent's file in this matter, which had not yet been received. Bar counsel requested a specific response and a copy of respondent's complete file no later than April 20, 1993. Respondent did not reply.

On April 30, 1993, bar counsel wrote to respondent and reminded him that she

had requested a response by April 20, 1993. Bar counsel asked respondent to comply with her request no later than Friday, May 14, 1993, and to produce a complete copy of respondent's file. Bar counsel reminded respondent that failure to furnish information or respond to a request from bar counsel without justifiable reason may be grounds for independent imposition of sanction under both Rule 6D of Administrative Order 9 and DR 1-102(A)(5). Respondent failed to respond.

On May 5, 1993, bar counsel sent to respondent, by certified mail, a copy of her letter of April 30, 1993. Bar counsel received the domestic return receipt signed by respondent on May 10, 1993. Respondent failed to respond.

On June 21, 1993, investigator Jean Cass wrote to respondent to arrange an interview date. She offered four alternative dates, between June 28 and 30, as possibilities. She again requested his file on Mrs. Broekhuizen. Respondent failed to respond to his letter, which he received on June 25, 1993.

On October 13, 1993, investigator Anne Buttimer spoke with respondent and sent a confirmation letter to respondent that she was going to pick up respondent's Broekhuizen file (and others) at his office in Windsor on October 15, 1993. When investigator Buttimer arrived as scheduled, respondent was not present and had not made arrangements to turn over the files. The office person present called respondent, after which investigator Buttimer was informed that respondent would send the files to bar counsel's office for delivery on October 18, 1993. The files did not arrive as promised.

On October 18, 1993, investigator Buttimer confirmed, in a letter to respondent, an interview date of October 29, 1993, at bar counsel's office. On October 26, 1993, respondent sent a letter to bar counsel informing her that he would not be in attendance on the 29th, as he was

retaining an attorney and would be in touch soon. Respondent's attorney entered an appearance on December 21, 1993.

Respondent never did meet with bar counsel's investigator to discuss the Broekhuizen case. On November 24, 1993, respondent informed bar counsel that he no longer had any file on Mrs. Broekhuizen, as he had turned over the original to Mr. Polidor in 1991.

Respondent filed a timely answer to the formal charges in this case. Respondent did appear for deposition on December 20, 1993, pursuant to a subpoena.

DR 6-101(A)(3) provides that an attorney not "[n]eglect a legal matter entrusted to him." By not diligently addressing the needs and concerns of Elaine Broekhuizen in the administration of her father's estate and by failing to forward her file to new counsel in a timely manner, respondent violated this disciplinary rule.

In consistently, over two years, failing to respond to reasonable requests from bar counsel for information, respondent violated Administrative Order 9, Rule 6D and engaged in conduct prejudicial to the administration of justice, in violation of DR 1-102(A)(5).

## COUNT II - PCB FILE NO. 93.12

In July of 1989, Scott Bashaw was seriously injured when an intoxicated acquaintance of his threw him over a railing of a deck at a modular home owned by Mark Kearney, Mr. Bashaw's employer. The home was leased to a tenant and co-worker, Barry Barlow. The land on which the home and deck were constructed was owned separately by Coastal Imports, Inc., a company wholly owned by Mr. Kearney. Mr. Bashaw's medical expenses were over $ 10,000. He had no insurance.

The next month, Mr. Bashaw consulted

with respondent, who agreed to represent him for a reasonable contingency fee. Mr. Bashaw selected respondent as he could not afford to pay any up-front fees or expenses, as expected by other attorneys he consulted. Had respondent not agreed to the representation, it is likely that Mr. Bashaw would have gone unrepresented.

Respondent attempted to obtain relief for Mr. Bashaw from Mr. Kearney's insurance company. The insurance company denied liability. In May of 1990, respondent filed a complaint on behalf of Mr. Bashaw against Mark Kearney and Coastal Imports. Respondent's theory against the two entities was that, as owners of the home and land, they had the responsibility to provide a safe railing around the deck, and they failed in that duty.

Depositions were taken in December of 1991. At the deposition of Mr. Kearney, respondent learned for the first time that titles to the home and land were split. Scott Bashaw testified that there was no fault in the design or construction of the deck. Respondent left the depositions with the opinion that his cases were substantially weakened.

At some point, respondent received a settlement offer of $ 2,500. Respondent met with Mr. Bashaw to discuss the offer. Respondent did not inform Mr. Bashaw that, in his opinion, the cases against the named defendants were weak. Mr. Bashaw informed respondent that $ 2,500 was insufficient to cover his medical expenses. Respondent indicated that perhaps they could get the offer up to $ 5,000. Respondent did not give Mr. Bashaw the benefit of his advice on the matter of accepting the offer or continuing the lawsuit. Mr. Bashaw decided to continue the lawsuit in hopes of receiving $ 5,000, thinking that, as respondent had told him early on in the representation, his case against the named defendants was strong.

On December 30, 1991, Coastal Imports filed a motion for summary judgment. On January 9, 1992, Mark Kearney filed a similar motion. Respondent did not respond to the motions within the thirty-day time period provided by the rule. Mark Kearney's attorney filed a request for a default judgment on February 11, 1992. On February 12, 1992, respondent filed a letter with the court for additional time to respond, as he had been ill for ten days. Respondent's request was granted, over opposition of the attorney for Coastal Imports. Respondent did not file a written response to the motions.

The motions were heard on April 15, 1991. Respondent appeared to address them, as did the attorneys for the defendants. The court granted both defendants' motions for summary judgment, holding that there was no legal theory under which the plaintiff could recover. Respondent did not promptly inform Mr. Bashaw that the court had dismissed his lawsuit.

Respondent has continued to represent Mr. Bashaw in a separate lawsuit against Barry Barlow, the occupant of the home, on the basis of social host liability. The acquaintance who threw Mr. Bashaw from the deck is judgment proof.

Counsel for Coastal Imports filed a complaint against respondent with the Professional Conduct Board, alleging knowing filing of a frivolous lawsuit. On February 26, 1993, the Chair of the Board sent respondent a copy of the complaint and asked him to file a written response within twenty days. He advised respondent that failure to furnish information or respond to a request from bar counsel without justifiable reason may be grounds for independent imposition of sanction under DR 1-102(A)(5). Respondent failed to answer.

Bar counsel sent a copy of the Chair's letter of February 26, 1993, to respondent on June 3, 1993, by certified mail, return receipt requested. Respondent's secretary, Kathy Davis, accepted delivery on June 7, 1993.

On June 16, 1993, respondent submitted a written response to the complaint. In his letter, respondent stated that he did not believe that he violated the Code by acceding to his client's wishes to have the defense make its case in court, rather than dismissing the complaint. Respondent failed to address the additional allegations.

Bar counsel's investigator wrote to respondent a few days later by certified mail, return receipt requested. She asked respondent to meet with her to discuss the Bashaw matter as well as others. She offered available dates of June 28 through 30, 1993. She reminded respondent that his refusal to cooperate with bar counsel or failure to respond to a reasonable request for information by·bar counsel may constitute grounds for discipline under the rules of the Vermont Supreme Court.

Respondent's secretary, Kathleen Davis, accepted delivery of this letter on June 25, 1993. Respondent failed to respond to the letter.

On September 10, 1993, respondent was served with the petition of misconduct. He filed a timely answer.

In failing to advise Mr. Bashaw on the merits of his claims against Mark Kearney so that Mr. Bashaw could make an informed decision on a settlement offer, respondent violated DR 6-101(A)(3) (neglect).

In failing to respond to reasonable requests from bar counsel, respondent violated Administrative Order 9, Rule 6D and engaged in conduct prejudicial to the administration of justice, in violation of DR 1-102(A)(5).

## COUNT III - PCB FILE NO. 93.32

In December 1992, Loretta Fleming consulted respondent about possible representation in civil litigation against the Windsor Police Department. Mrs. Fleming's parked car had been struck by a passing vehicle. She had objections to the accident report prepared by the police officer and wanted to know if anything could be done to alter it officially. Respondent asked Ms. Fleming to leave her file with him to review and assured her that her file — which contained numerous original documents — would be safe with him.

Over the next five months, Mrs. Fleming telephoned and wrote to respondent on numerous occasions to inquire about the status of her case. Ms. Fleming left many messages on respondent's answering machine and with respondent's secretary to have respondent contact her. Respondent failed to respond to her entreaties. Mrs. Fleming did not have a telephone.

Beginning in February 1993, Mrs. Fleming continued to call respondent, but now for the return of her file. She had no success in reaching respondent or obtaining her file. On May 28, 1993, Mrs. Fleming wrote to respondent by certified mail. She reminded him of the history of her case and his failure to respond to her numerous calls and letters. She threatened to take further action if she did not receive her file by June 4, 1993. She told respondent that she was sending a copy of the May 28, 1993 letter to the Professional Conduct Board.

Respondent mailed the complete file to Mrs. Fleming on June 4, 1993, which she received the next day.

Mrs. Fleming suffered no injury.

In failing to respond to the legal inquiry and the telephone calls of Mrs. Fleming, respondent violated DR 6-101(A)(3) (neglect).

In failing to return promptly Mrs. Fleming's file to her, respondent violated DR 9-102(B)(4) (failure to relinquish property of a client).

## B. RECOMMENDED SANCTION

Bar counsel and respondent jointly recommended a sanction of public reprimand. We concur and recommend that probation be imposed as well.

In deciding upon the appropriate sanction, we rely upon ABA Standards for Imposing Lawyer Sanctions (1986) (hereinafter referred to as "Standards"). The Standards suggest four criteria in determining the appropriate sanction:

(1) the duty violated;

(2) the lawyer's mental state;

(3) the potential or actual injury caused by the lawyer's misconduct;

(4) the existence of aggravating or mitigating factors.

1. *Duties Violated*

Respondent violated his duty of diligence, a duty which he owes to each of his clients. The duty owed to the client:

arises out of the nature of the basic relationship between the lawyer and the client. The lawyer is not required to accept all clients, but, having agreed to perform services for a client, the lawyer has duties that arise out of the ethical rules, agency law, and under the terms of the contractual relationship with the individual client.

Introduction to Standard 4.0.

The respondent also has a duty to the profession in his response to the lawyer disciplinary system. The respondent was not timely in his response to repeated requests by bar counsel, although some of the delay in this case cannot be attributed to him.

2. *The Respondent's Mental State*

There are aspects of the respondent's mental state during the times in question that are both aggravating and mitigating. It is clear that he never intended to hurt or neglect any of his clients. The respondent testified and we accept the notion that he often found it difficult to say "no" to those who sought his help. As a result, the respondent was taking on cases at a frequency that would eventually render his caseload unmanageable. When he finally appreciated that he could not adequately represent the interest of so many clients, the respondent took steps to curtail his practice by closing down his two store front offices.

Based on this scenario, we conclude that respondent's state of mind was one of negligence, i.e., "the failure of a lawyer to heed a substantial risk that circumstances exist or a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in this situation." Standards at 7.

Similarly, as to the respondent's failure to promptly cooperate with disciplinary counsel, we conclude that the respondent's actions were not an intentional effort to ignore the process. Rather it appears to have been yet another symptom of a law practice overburdened by an unworkable caseload. Just as clients did not receive timely responses to pressing matters, neither did bar counsel. It was the unreasonable amount of work which respondent had taken on, not any intentional act to thwart the disciplinary system, which led to his delay in responding to bar counsel's inquiries.

3. *Injury*

Mr. Bashaw was financially injured when he gave up the opportunity to accept $ 2,500. Neither Mrs. Broekhuizen nor Mrs. Fleming was financially injured. Both, however, experienced frustration and anguish as a result of their relationship with respondent. While there may have been some delay in the administration of Mrs. Broekhuizen's father's estate during respondent's involvement, a five-month delay in the early period of an estate is not uncommon.

4. *Aggravating and Mitigating Factors*

There are several aggravating factors present.

Respondent received a public reprimand on August 8, 1991, in PCB Files No. 89.51 and 89.65. That misconduct involved improper communications with prospective jurors [DR 7-108], engaging in conduct involving dishonesty [DR 1-102(A)(4)], engaging in conduct prejudicial to the administration of justice [DR 1-102(A)(5)], and guaranteeing financial assistance to a client [DR 5-103(B)].

There are multiple offenses present, and some of the offenses present a pattern of misconduct — specifically those involved in neglecting legal matters entrusted.

Lastly, in aggravation, respondent has substantial experience in the practice of law.

Several mitigating factors are also present. It is uncontroverted that the respondent had no dishonest or selfish motive. On the contrary, we have concluded that while the respondent should at some point have recognized that he was taking on too heavy a caseload, this was precipitated by a genuine desire on his part to make his legal services readily available to the public. This was often manifested in an effort to help that portion of the public that is often unable to retain counsel because of financial circumstances. Too few lawyers see this as a personal responsibility, and respondent's efforts in this regard are commendable.

In further mitigation, we believe that the respondent regrets his actions and that he has taken steps to avoid similar problems in the future. Respondent has limited the number of clients he represents. The closing down of the two store front offices was a major step in the right direction and is evidence of the respondent's commitment to reduce his caseload.

We are concerned that the behavior exhibited by the respondent in these cases reveals disturbing patterns of neglect and unresponsiveness to clients' needs. This led us to consider whether suspension would be a more appropriate sanction. However, each particular case of misconduct, in and of itself, would likely warrant only a private admonition. While we acknowledge and welcome our responsibility to make an independent determination as to the appropriate sanction, bar counsel's recommendation is given great weight. She has displayed a very thorough familiarity with all of the facts and circumstances surrounding the events in question. In the circumstances presented here, we are confident that the sanction of public reprimand will adequately protect the public and the profession without unduly penalizing the respondent.

In conjunction with our recommended sanction, we believe a nine month period of probation should be imposed to further protect the public. A condition of this probation should be that the respondent and a member of the Vermont Bar acceptable to respondent and bar counsel shall perform a monthly review of the respondent's caseload. Respondent and probation counsel should be required to file with the Board quarterly reports, in writing, which verify each monthly review. In addition, probation counsel should be required, in writing, to make such recommendations to the respondent regarding timely attention to case matters as he or she may feel are appropriate. Finally, the terms of probation should require respondent and probation counsel to retain copies of all such recommendations.